Filed 4/24/24; Certified for Publication 5/16/24 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| CAJON VALLEY UNION SCHOOL DISTRICT et al., | C097429 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34-2018-80002921-CU-WM-GDS) |
| v. | |
| TRACY DRAGER, as Auditor-Controller, etc., et al., | |
| Defendants and Respondents; | |
| CITY OF EL CAJON et al., | |
| Real Parties in Interest and Respondents. | |

SUMMARY OF THE APPEAL

Petitioners and appellants Cajon Valley Union School District (CVUSD) and

Grossmont Union High School District (GUHSD, together the Districts) are both public

1

school districts located within the boundaries of the former El Cajon Redevelopment Agency (RDA), in the respondent County of San Diego. In 1988 the Districts entered into "pass-through" agreements with the RDA in which the RDA agreed to provide the Districts a portion of its annual property tax increment revenue up to a specified dollar cap.

After the RDA was dissolved as part of the "Great Dissolution" of California's redevelopment agencies in 2012 (see *City of Pasadena v. Cohen* (2014) 228 Cal.App.4th 1461, 1463), the respondent San Diego County Auditor-Controller continued to make payments pursuant to the agreements' terms. The Auditor-Controller made a final pass-through payment to GUHSD in Fiscal Year 2011-2012, when the amount GUHSD had received under its agreement with the RDA reached the agreement's cap. As of April 28, 2021, payments made to CVUSD under its agreement had not reached that agreement's cap. GUHSD, in August 2016, and CVUSD, in January 2017, both wrote to the Auditor-Controller asking the Auditor-Controller to confirm she would make statutorily defined pass-through payments to them under Health and Safety Code sections 33607.7, subdivision (b)(2), and 34183, subdivision (a)(1), after their respective agreed upon caps were reached. (Statutory section citations that follow are to the Health and Safety Code unless otherwise stated.) The Auditor-Controller responded that she would not make further pass-through payments to the Districts once their respective caps were reached.

The Districts sought a writ of mandate to compel the Auditor-Controller to make statutorily defined pass-through payments to them under sections 33607.7, subdivision (b)(2), and 34183, subdivision (a)(1), after the caps in their respective agreements are reached. The Districts also sought related declaratory relief. The trial court denied the requested relief. We affirm the judgment.

2

<u>Factual</u> <u>and</u> <u>Statutory</u> <u>Background</u>

The facts of this matter are largely undisputed.  The history of redevelopment statutes and when statutes were passed or amended in relation to when the RDA took certain actions are key to understanding the factual context in which this case arose.

<u>General</u> <u>Redevelopment</u> <u>Practices</u> <u>Prior</u> <u>to</u> <u>1994</u>

The historical underpinnings of California's redevelopment agencies were discussed in *California Redevelopment Association v. Matosantos* (2011) 53 Cal.4th 231, 245-248 (*Matosantos I*), and need not be detailed here.  "Briefly summarized, since the 1940's, the Community Redevelopment Law ([] § 33000 et seq.) allowed sponsoring cities and counties to establish redevelopment agencies to address urban blight."  (*City of Cerritos v. State of California* (2015) 239 Cal.App.4th 1020, 1027-1028 (*Cerritos*).)

Under the Community Redevelopment Law, "[r]edevelopment agencies generally could not levy taxes, and, instead, relied primarily on tax increment financing as a funding source as authorized by article XVI, section 16 of the California Constitution and . . . section 33670.  (*Matosantos I*, *supra*, 53 Cal.4th at p. 246.)  Under that funding mechanism, redevelopment agencies received the growth in property taxes from a designated redevelopment plan area, known as the property tax increment, while the other public entities entitled to receive property tax revenue in the redevelopment area were allocated a portion based on the assessed value of the property prior to the effective date of the redevelopment plan (known as the frozen base).  (*Id.* at pp. 246–247; Cal. Const., art. XVI, § 16, subds. (a), (b); [] § 33670.)"  (*Cerritos*, *supra*, 239 Cal.App.4th at p. 1028.)

"To mitigate the burden on other public agencies from the diversion of tax increments to a redevelopment plan, redevelopment agencies, prior to 1994, often agreed to pass through part of their tax increment revenues to the other public agencies.

(§ 33401, added by Stats. 1984, ch. 147, § 13, p. 508 and repealed by Stats. 1993, ch. 942, § 23, p. 5358.)" (*County of Solano v. Vallejo Redevelopment Agency* (1999) 75 Cal.App.4th 1262, 1268.)

RDA and Districts' Actions Prior to 1994

In July 1987, the City Council for the City of El Cajon adopted an ordinance that allowed the RDA to implement an amended redevelopment plan.

In April 1988, CVUSD and the RDA entered into an agreement (CVUSD Agreement). According to the CVUSD Agreement, the RDA would provide CVUSD with a portion of the tax increment revenue generated within the RDA project area until a total of $30 million was paid to the CVUSD.

In May 1988, GUHSD and the RDA entered into an agreement with an addendum (GUHSD Agreement). According to the GUHSD Agreement, the RDA would provide GUHSD with a portion of the tax increment revenue generated within the RDA project area until a total of $9.2 million was paid to the GUHSD.

Applicable RDA Laws from 1994 through 2011

In 1993, the Legislature passed, and the Governor approved, Assembly Bill No. 1290 (1993-1994 Reg. Sess.) (Assembly Bill 1290). (See Stats. 1993, ch. 942.)

As relevant here, Assembly Bill 1290 added section 33333.6, which imposed time limits on "every redevelopment plan adopted on or before December 31, 1993." (Stats. 1993, ch. 942, § 9.) Among other things, the enacted version of section 33333.6 limited the time for then-existing redevelopment agencies to establish loans, advances, and indebtedness to 20 years from the adoption of the redevelopment plan or to January 1, 2004, whichever is later, with certain exceptions not at issue here. (*Ibid.* [including then section 33333.6, subd. (a)(1)-(2)]; see also Assem. Floor analysis of Assem. Bill 1290 (1993-1994 Reg. Sess.), item 2 available at https://perma.cc/X5SK-U7RF (as of Apr. 15,

4

2024) [identifying limiting the term for incurrence of debt to 20 years as a significant change contained in the bill]; see also marked version of Stats. 1993, ch. 942, § 8.)

Assembly Bill 1290 also added versions of sections 33607.5 and 33607.7. (Stats. 1993, ch. 924, §§ 31-31.5.)

Section 33607.5, as adopted by Assembly Bill 1290, contained various provisions applicable to redevelopment areas with plans adopted after January 1, 1994, or with plans adopted before January 1, 1994, that were amended after that date to include new territory (Stats. 1993, ch. 942, § 31 [subd. (a) sets out the section's scope].) Subdivisions (b) through (d) provided formulas for those redevelopment agencies to make pass-through payments to affected taxing entities.

Section 33607.7, as adopted by Assembly Bill 1290, stated it applied when redevelopment plans that had been adopted prior to January 1, 1994, were amended with one of a specified list of amendments, including amendments that would increase a limit on dollars allocated to the redevelopment agency or a time limit in the plan to establish loans, advances, and indebtedness. (Stats. 1993, ch. 942, § 31.5 [subd. (a) sets out the section's scope].) Under the section 33607.7, subdivision (b), as adopted in 1993, "[i]f a redevelopment agency adopts an amendment that is governed by the provisions of this section, it shall pay to each affected taxing entity either of the following: [¶] (1) If an agreement exists that requires payments to the taxing entity, the amount required to be paid by an agreement between the agency and an affected taxing entity entered into prior to January 1, 1994. [¶] (2) If an agreement does not exist, the amounts required pursuant to subdivisions (b), (c), (d), and (e) of Section 33607.5, until termination of the redevelopment plan, calculated against the amount of assessed value by which the current year assessed value exceeds an adjusted base year assessed value." (*Ibid.*) Later amendments to section 33607.7 did not change the language from subdivision (b) we quote here. (Stats. 2001, ch. 741, § 14; Stats. 2011, ch. 5, § 5; Stats 2015, ch. 13, § 45.)

5

In 2001, the Legislature amended section 33333.6 with Senate Bill No. 211 (2001-2002 Reg. Sess.) (Senate Bill 211). Under the amended version of subdivision (e)(2), effective January 1, 2002, redevelopment agencies with plans adopted prior to January 1, 1994, could amend their plans to eliminate the time limit on establishing loans, advances, and indebtedness which had been imposed with the Assembly Bill 1290 version of the statute. (Stats. 2001, ch. 741, § 5.) If a redevelopment agency elected to amend its plan under the amended statute, it would be required to "make the payment to affected taxing entities required by Section 33607.7." (*Ibid.*) This requirement remained in section 33333.6 in 2007—and remains today—though by 2007 the statute had been amended such that the operative language now appears in section 33333.6, subdivision (e)(2)(B).

Senate Bill 211 also amended the scope of redevelopment agency plan amendments that would trigger section 33607.7's application to include section 33333.6, subdivision (e)(2), amendments that lifted the time limit to incur debt. As amended in 2001, section 33607.7, subdivision (a), specified the section, "shall apply to a redevelopment plan amendment for any redevelopment plans adopted prior to January 1, 1994, that . . . eliminates pursuant to paragraph (1) of subdivision (e) of Section 33333.6, the time limit on the establishing of loans, advances, and indebtedness established pursuant to paragraphs (1) and (2) of subdivision (a) of Section 33333.6, as those paragraphs read on December 31, 2001." (Stats. 2001, ch. 741, § 14, adopting § 33607.7, subd. (a), italics added.)

### 2007 Amendment to the RDA Plan

In 2007, the City of El Cajon adopted Ordinance No. 4884. With the ordinance, the city, amended the RDA's redevelopment plan to "eliminate[] the time limits on the establishment of loans, advances, and indebtedness." The ordinance also authorized and directed the RDA to transmit copies of the ordinance to "affected public entities and to

take all other actions required pursuant to . . . section 33607.7 to implement th[e] [o]rdinance."

<u>The Great Dissolution</u>

In June 2011, the Legislature passed, and the Governor signed, Assembly Bill 1X 26 (2011–2012 Reg. Sess.) (the Dissolution Law), which, "dissolve[d] all redevelopment agencies . . . ." (*Matosantos I*, *supra*, 53 Cal.4th at pp. 250-251.) The Dissolution Law established successor agencies to continue to meet the enforceable obligations of the dissolved redevelopment agencies and otherwise wind down redevelopment affairs. (See § 34177.) Under the Dissolution Law, tax increment revenues that would have gone to redevelopment agencies must be deposited in a local trust fund each county auditor-controller is required to create and administer. (§§ 34170.5, subd. (b), 34182, subd. (c)(1); *City of Chula Vista v. Drager* (2020) 49 Cal.App.5th 539, 549.) This fund is called the Redevelopment Property Tax Trust Fund. (§ 34170.5, subd. (b).)

"Section 34183 establishes the priority in which the county auditor-controller must allocate the revenue from the trust fund." (*Chula Vista*, 49 Cal.App.5th at p. 549.) This prioritization is sometimes referred to as a " 'waterfall.' " (*Ibid.*) Section 34183, subdivision (a), provides in relevant part:

"Notwithstanding any other law, from February 1, 2012, to July 1, 2012, and for each fiscal year thereafter, the county auditor-controller shall, after deducting administrative costs allowed under Section 34182 and Section 95.3 of the Revenue and Taxation Code, allocate moneys in each Redevelopment Property Tax Trust Fund as follows:

"(1) (A) Subject to any prior deductions required by subdivision (b), first, the county auditor-controller shall remit from the Redevelopment Property Tax Trust Fund to each local agency and school entity an amount of property tax revenues in an amount equal to that which would have been received under Section 33401, 33492.140, 33607,

7

33607.5, 33607.7, or 33676, as those sections read on January 1, 2011, or pursuant to any passthrough agreement between a redevelopment agency and a taxing entity that was entered into before January 1, 1994, that would be in force during that fiscal year, had the redevelopment agency existed at that time.  The amount of the payments made pursuant to this paragraph shall be calculated solely on the basis of passthrough payment obligations, existing before the effective date of this part and continuing as obligations of successor entities, shall occur no later than May 16, 2012, and no later than June 1, 2012, and each January 2 and June 1 thereafter. . . . .”

<u>Pass-through</u> <u>Payments</u> <u>to</u> <u>the</u> <u>Districts</u> <u>Post</u> <u>Dissolution</u>

Following the dissolution of redevelopment agencies, the Auditor-Controller continued making payments according to the agreements.  (See § 34183, subd. (a)(1)(A).)

The $9.2 million cap under the GUHSD Agreement with the RDA was reached in Fiscal Year 2011-2012, and the Auditor-Controller made the final payment in January 2013.  In August 2016, GUHSD sent a letter to County Counsel for the County of San Diego.  GUHSD argued that pursuant to section 34183, subdivision (a)(1), the Auditor-Controller was required to provide GUHSD with annual payments equal to statutorily defined pass-through payments under section 33607.7, subdivision (b)(2), once the contractually established cap in the GUHSD agreement was reached.  GUHSD requested the Auditor-Controller make these payments.

County Counsel responded on behalf of the Auditor-Controller, denying the request.  The Auditor-Controller asserted it did not have authority to distribute statutorily defined passthrough payments to GUHSD under section 34183, subdivision (a)(1).

In January 2017, CVUSD wrote the Auditor Controller and sought confirmation that the Auditor-Controller would provide it with an amount equal to statutorily defined pass-through payments under section 33607.7, subdivision (b)(2), once the CVUSD had received a total amount equal to the CVUSD Agreement cap.  The Auditor-Controller

responded that it would not make section 33607.7, subdivision (b)(2), payments once the cap was reached.

As of April 28, 2021, CVUSD had received $25,313,936 pursuant to the CVUSD Agreement.

Trial Court Proceedings

On December 29, 2017, the Districts filed a petition for writ of mandate against then-respondent Tracy Sandoval, in her official capacity as the then San Diego County Auditor-Controller, and respondent County of San Diego in the Superior Court of San Diego County. Sandoval has been succeeded in office by Tracy Drager. Throughout this opinion we refer to the respondent as the Auditor-Controller. The Districts filed a first amended petition on April 19, 2018, (the petition). At some point, the action was transferred to the Superior Court of Sacramento County.

The petition sought a writ of mandate compelling the Auditor-Controller (1) to make statutory pass-through payments to the Districts under section 33607.7, subdivision (b)(2), once payments under the Districts' respective agreements with the former redevelopment agency cease, i.e., once they reach their respective caps and (2) to reallocate to GUHSD amounts they allege were due under section 33607.7, subdivision (b)(2) for fiscal years 2012-2013 through 2016-2017. The petition also sought a declaration that section 33607.7, subdivision (b), requires the Auditor-Controller to make pass-through payments to the Districts each year the equivalent of tax increment is deposited into the Redevelopment Property Tax Trust Fund in accordance with the former redevelopment agency's agreements with the Districts, or, if no payment is due under the terms of the Districts' respective agreements, pursuant to section 33607.7, subdivision (b)(2).

The petition identified various real parties in interest, including the Successor Agency to the former El Cajon Redevelopment Agency (Successor Agency). The petition

9

also named as real parties in interest affected taxing entities that would possibly receive reduced distributions for the Successor Agency's Redevelopment Property Tax Trust Fund under sections 34183, subdivision (a)(4), and 34188 if the Districts' petition was granted.

A tentative ruling on the petition, which included a full proposed statement of decision was issued in December 2021. There was a hearing on June 17, 2022, after which the court issued a proposed statement of decision and proposed judgment on July 11, 2022. After the petitioners and respondents made a joint request to make corrections to the misuse of "DOF" in places where the text should have said "Auditor-Controller" the court made the requested modifications and issued a final judgment and statement of decision on October 11, 2022. The court denied the petition and request for declaratory relief, and issued a judgment in favor of the respondents on October 11, 2022.

The Districts filed a notice of appeal on November 16, 2022.

## DISCUSSION

The Districts contend that under section 33607.7—as it is applies to the Auditor-Controller under section 34183—they are entitled to (1) contractually defined pass-through payments until the caps are reached, followed by (2) statutorily defined pass-through payments until the termination of the redevelopment plan. The Auditor-Controller, in contrast, argues the Districts are not entitled to receive statutorily defined pass-through payments once the payment caps in the agreements are reached. The trial court agreed with the Auditor-Controller. So do we. Because we can dispose of this appeal on this merits issue, we need not and do not consider arguments raised by the Auditor-Controller regarding the ability of the Districts to make this challenge.

### I

### *Standard and Principles of Review*

At issue in this appeal is the proper interpretation of section 33607.7.

10

"We apply a de novo standard of review to questions of statutory interpretation. (*Concerned Dublin Citizens v. City of Dublin* (2013) 214 Cal.App.4th 1301, 1311 [].) ' "Our fundamental task in interpreting a statute is to determine the Legislature's intent so as to effectuate the law's purpose." ' (*Carson Citizens for Reform v. Kawagoe* (2009) 178 Cal.App.4th 357, 366 []; see *Fluor Corp. v. Superior Court* (2015) 61 Cal.4th 1175, 1198 [].) ' " 'We begin with the plain language of the statute, affording the words of the provision their ordinary and usual meaning and viewing them in their statutory context, because the language employed in the Legislature's enactment generally is the most reliable indicator of legislative intent.' [Citations.] The plain meaning controls if there is no ambiguity in the statutory language. [Citation.] If, however, 'the statutory language may reasonably be given more than one interpretation, " ' "courts may consider various extrinsic aids, including the purpose of the statute, the evils to be remedied, the legislative history, public policy, and the statutory scheme encompassing the statute." ' " ' " ' (*Fluor Corp.*, *supra*, at p. 1198.)" (*Center for Biological Diversity v. Department of Conservation, etc.* (2019) 36 Cal.App.5th 210, 231-232.)

II

*Only One Form of Payment Was Required*

Here we need look no further than the plain language of section 33607.7 to ascertain its meaning. According to subdivision (b): "*If a redevelopment agency adopts an amendment that is governed by the provisions of this section*," which includes, with changes made by Assembly Bill 211, amendments lifting the time limit to establish loans, advances and indebtedness, "it shall pay to each affected taxing entity *either* of the following: [¶] (1) *If an agreement exists that requires payments to the taxing entity*, the amount required to be paid by an agreement between the agency and an affected taxing entity entered into prior to January 1, 1994" (contractually defined pass-through payments) or "(2) *If an agreement does not exist*, the amounts required pursuant to

11

subdivisions (b), (c), (d), and (e) of Section 33607.5, until termination of the redevelopment plan . . ." (statutorily defined pass-through payments). (Italics added; see also § 33607.7, subd. (a).)

"The term 'either' means 'one or the other.' " (*Goldstein v. California Unemployment Ins. Appeals Bd.* (2019) 34 Cal.App.5th 1006, 1018-1019.) Thus, under the plain and unambiguous language of the statute, when the RDA adopted an amendment lifting the time limit to establish loans, advances, and indebtedness, it triggered a statutory obligation to pay one or the other of two things to affected taxing entities, depending on whether the RDA had entered into a pass-through agreement with any particular entity before January 1, 1994, that required pass-through payments to that entity. If such an agreement did exist, the RDA would need to make the contractually defined pass-through payments pursuant to section 33607.7, subdivision (b)(1). If such an agreement did not exist, the RDA would need to make statutorily defined pass-through payments pursuant to section 33607.7, subdivision (b)(2). Either way, with respect to the various affected taxing entities, the RDA would need to make "one or the other" type of payment. It would not be required to make *both* payments, or all of one type of payment then part of the other in some cases.

As relevant here, the statute contains *no language* that suggests an RDA would be required, in instances in which they had entered agreements with payment caps that would be reached before the RDA plan expired, to make contractually defined payments until the contracts were satisfied *and then* statutorily defined pass-through payments. We will not read such a requirement into the plain language of section 33607.7. (*S.V. v. Superior Court* (2017) 13 Cal.App.5th 1174, 1179 ["When interpreting a statute, our role is 'to ascertain and declare what the statute contains, not to change its scope by reading into it language it does not contain or by reading out of it language it does. We may not rewrite the statute to conform to an assumed intention that does not appear in its language.' (*Vasquez v. State of California* (2008) 45 Cal.4th 243, 253 [])"].)

12

Here, when the RDA lifted the loan, advance, and indebtedness time limit, it had then in-force pre-January 1, 1994, pass-through agreements with the Districts that required the RDA to make pass-through payments to the Districts.  Thus, when it lifted the limit, section 33607.7, subdivision (b), imposed a requirement on the RDA to pay the contractually defined pass-through payments.  That is all.  Plainly and unambiguously section 33607.7 does not require other payments.

The Districts' efforts to convince us otherwise are unavailing.  Moreover, "[w]hen statutory language is unambiguous, we must follow its plain meaning."  (*In re D.B.* (2014) 58 Cal.4th 941, 948; see also *Switzer v. Wood* (2019) 35 Cal.App.5th 116, 131 ["When statutory language is clear and unambiguous, as here, resort to the legislative history is unwarranted"].)

Sections 33333.6, subdivision (e)(2)(B), and 34183, subdivision (a)(1)(A), are of no help to the Districts.  Section 33333.6, subdivision (e)(2)(B), states that when "a redevelopment plan [was] amended by a legislative body by adoption of an ordinance to eliminate the time limit on the establishment of loans, advances, and indebtedness required by this section prior to January 1, 2002," the agency "shall make the payment to affected taxing entities required by Section 33607.7."  All this language does is require compliance with section 33607.7.

Similarly, section 34183, subdivision (a)(1)(A), requires "the county auditor-controller [to] remit from the Redevelopment Property Tax Trust Fund to each local agency and school entity an amount of property tax revenues in an amount equal to that which would have been received under Section . . . 33607.7 . . .  as [it] read on January 1, 2011, or pursuant to any passthrough agreement between a redevelopment agency and a taxing entity that was entered into before January 1, 1994, that would be in force during that fiscal year, had the redevelopment agency existed at that time."  All this does is require the Auditor-Controller to make pass-through payments from the Redevelopment Property Tax Trust Fund to affected taxing entities that the RDA would have been

13

required to make from its funds but for the Great Dissolution. Here, that required payment was equivalent to the payments required under section 33607.7, subdivision (b)(1), because that was the "one or the other" of the two pass-through payment paths the RDA's payments to the Districts fell on.

Section 33676, subdivision (b)(1) and (3), as adopted in Assembly Bill 1290 also does not help the Districts. Section 33676, subdivision (b)(1), refers to payments to an education agency "that is a basic aid district . . . at the time the ordinance adopting a redevelopment plan is adopted . . . shall receive annually." (See Stats. 1993, ch. 942, § 34.) Section 33676, subdivision (b)(3), applied to "a basic aid district or office at the time the ordinance amending a redevelopment plan is adopted pursuant to Section 33607.7" and stated those districts "shall receive" either funds pursuant to an agreement between the basic aid district and the RDA entered into before January 1, 1994, or, if there is no such agreement, funds pursuant to a statutory formula in fiscal years when funds are allocated. The Districts argue that because section 33607.7 does not contain similar language stating the type of pass-through payment will be determined based on whether a qualifying pass-through agreement existed at the time a redevelopment plan makes a triggering amendment, the Legislature must have intended the assessment as to the existence of an agreement that required a payment to occur every year. Thus, they reason, when an agreement cap was reached and there was no longer an agreement requiring a payment, the statutorily defined pass-through payment obligation would kick in for future years. This argument reads too much into the language of the statute.

The section 33676 language only reflects an understanding by the Legislature that the qualifying status of an entity receiving annual payments or fiscal year distributions under section 33676, subdivision (b)(1) or (3), conceivably could change over the life of those payments. That is, a basic aid district that receives payments under section 33676, subdivision (b)(1) or (3)(B)'s requirements to make annual or fiscal year payments might cease to be a basic aid district after the triggering event. The Legislature inserted

14

language that clarified what would happen if that change occurred—the status quo as to which payment path the district was under would remain the same. In contrast, the lack of a pre-January 1994 agreement between a redevelopment agency and entity was not going to change for the entities that receive the statutorily defined annual pass-through payments under 33607.7, subdivision (b)(2), and section 33607.5, subdivisions (b) through (e). An entity without a pre-January 1, 1994, pass-through agreement with a redevelopment agency on January 1, 1994 (or in 2001 or 2007) was not going to get a pre-January 1, 1994, agreement later.

## DISPOSITION

We affirm the judgment. Respondents shall recover their costs on appeal under California Rules of Court, rule 8.278(a).

_____

HULL, J.

We concur:

_____

EARL, P. J.

_____

WISEMAN, J.*

_____

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| CAJON VALLEY UNION SCHOOL DISTRICT et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> TRACY DRAGER, as Auditor-Controller, etc., et al., <br><br> Defendants and Respondents; <br><br> CITY OF EL CAJON et al., <br><br> Real Parties in Interest and Respondents. | C097429 <br><br> (Super. Ct. No. 34-2018-80002921-CU-WM-GDS) <br><br> ORDER CERTIFYING OPINION FOR PUBLICATION |

APPEAL from a judgment of the Superior Court of Alpine County, Stephen P. Acquisto, Judge. Affirmed.

Atkinson, Andelson, Loya, Ruud & Romo and Jeffrey A. Hoskinson for Plaintiffs and Appellants.

Thomas Deak, Senior Deputy County Counsel for Defendants and Respondents Tracy Drager, San Diego County (General Fund), San Diego County Library, San Diego County Street Lighting District and County Service Area No. 115 Drive.

1

Colantuono, Highsmith & Whatley, Holly O. Whatley and Liliane M. Wyckoff for Real Parties in Interest and Respondents City of El Cajon and Successor Agency to the Former El Cajon Redevelopment Agency.

THE COURT:

The opinion in the above-entitled matter filed on April 24, 2024, was not certified for publication in the Official Reports.  For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

BY THE COURT:

 

_____
EARL, P. J.

 

_____
HULL, J.

 

_____
WISEMAN, J.*

_____

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

2